IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTONIO PEARSON,                          :
            Plaintiff                     :
            v.                            :Case No. 3:09-cv-97-KRG-KAP
PRISON HEALTH SERVICE, et al.,            :
            Defendants                    :

Report and Recommendation

Recommendation

            Defendant McGrath has filed a motion for summary judgment
at docket no. 126, with supporting documents at docket no. 127,
docket no. 128, docket no. 129, and docket no. 141, and the other
remaining defendants (Papuga, Kline, Rhodes, Thomas) have filed a
motion for summary judgment at docket no. 130, with supporting
documents at docket no. 131, docket no. 132, docket no. 133, and
docket no. 142.    Plaintiff Pearson, represented by appointed
counsel, has replied at docket no. 136, with supporting documents
at docket no. 137, docket no. 138, docket no. 139, and docket no.
140.  The defendants' motions should be granted.

Report

            Plaintiff Antonio Pearson is an inmate in the custody of
the Pennsylvania Department of Corrections.    While Pearson was
incarcerated at S.C.I. Somerset on April 10, 2007, he complained
about abdominal pain.    The pain grew severe enough that by that
night he was screaming for medical attention.  At 2:50 a.m. in the
morning on April 11, 2007, Dr. Ghatge, on duty at the prison,
ordered Pearson to be admitted to the infirmary and placed on bed

rest with no food or drink by mouth.  Ghatge saw Pearson later that same morning and sent him to the Somerset Hospital, where he was admitted, diagnosed with appendicitis, and underwent an appendectomy.  Pearson had a urinary catheter inserted, and probably during the catheterization Pearson suffered a cut to his urethra.  Pearson returned to prison on April 14, 2007.  The next day Pearson was bleeding from his penis and a corrections officer reported this to personnel at the medical department.  That evening, April 15, 2007, Dr. McGrath, on duty but not at the prison, ordered Pearson admitted to the infirmary overnight and ordered lab tests for April 16, 2007.  On April 16, 2007, McGrath saw Pearson, diagnosed the bleeding as a not-unusual result of the catheterization, and discharged Pearson.  McGrath saw Pearson again at 8:30 a.m the next day, April 17, 2007.  McGrath diagnosed Pearson as having fresh bleeding and sent Pearson to the Somerset Hospital emergency room.  Personnel there performed a cauterization.  Pearson then returned to prison the same day. Ghatge ordered Pearson to be admitted to the infirmary, where he was observed until his return to his unit on April 19, 2007.  That same day the catheter was removed.  Pearson did not have any further reported complications.

I

Two years after that episode in which Pearson was provided medical attention, surgical intervention, and follow-up

2

care, Pearson filed a complaint dated April 10, 2009, claiming that twenty-eight employees of or contractors with the Pennsylvania Department of Corrections had violated the Eighth Amendment. I screened the complaint as required by 28 U.S.C.§ 1915A, found that Pearson had not stated a federal claim under Estelle v. Gamble, 429 U.S. 97, 106 (1976) because he had not alleged facts from which a plausible inference of deliberate indifference, see Farmer v. Brennan, 511 U.S. 825, 837 (1994), could be drawn. The Court agreed and dismissed the complaint without prejudice to prosecuting any state law malpractice claims in the Court of Common Pleas pursuant to 42 Pa.C.S.§ 5103(b).

A panel of the Third Circuit vacated the dismissal of the complaint in October 2009 in an unsigned nonprecedential opinion which held at page 7 that Pearson had stated a claim of deliberate indifference against some unnamed defendants described as three nurses, and held at page 8 that Pearson had stated a claim of deliberate indifference against McGrath for allegedly being angry at being disturbed at home on April 15, 2007 and telling a physician assistant to "just" place Pearson in the infirmary overnight, and held at page 8 that Pearson had stated a claim of deliberate indifference against an unnamed corrections officer who subsequently had allegedly ordered Pearson to dispose of blood in order "to hide" Pearson's urethral injury. The opinion also stated at page 8 n.2 that Pearson had not stated a claim for deliberate

3

indifference by alleging that the unnamed physician who performed the appendectomy had not called Pearson back for a check-up or by alleging that McGrath had refused to authorize a check-up to determine whether a "tumor/mass" that Pearson's complaint alleged had been removed from his stomach had grown back, but that Pearson should be allowed to amend his complaint to attempt to state a claim of deliberate indifference.

Pearson was granted a year of extensions to amend his complaint and eventually filed an amended complaint in January 2011 at docket no. 35.  I screened the amended complaint under 28 U.S.C.§ 1915A as well, and directed Pearson to provide the Marshal with copies of the amended complaint to serve defendants Kline, McGrath, Papuga, and Rhodes.  I again recommended dismissal of the rest of the amended complaint without prejudice to pursuing any state law claims in state court because the amended complaint did not allege deliberate indifference as to any of the other defendants and there was no reason to exercise supplemental jurisdiction as to state law claims.  docket no. 36.

McGrath entered an appearance through counsel and moved to dismiss the complaint, a motion I recommended denying without prejudice to a motion for summary judgment.  I issued a discovery schedule. McGrath subsequently filed a motion for summary judgment that I recommended be granted; I also recommended that Pearson's claims against the other three defendants should be dismissed for

4

failure to prosecute because Pearson had failed to provide service copies.

The Court granted summary judgment to McGrath and dismissed the amended complaint as to the other three defendants in September 2011. docket no. 68. In April 2013, another panel of the Court of Appeals issued another unsigned *per curiam* opinion, this one holding at page 7 that McGrath's motion for summary judgment was insufficient because "it is McGrath's burden as the movant to show there is no genuine issue of material fact," and there was no affidavit from McGrath "describing his treatment decisions," or explaining why "the delay in treatment Pearson endured while allegedly in pain and bleeding from his penis was reasonable." The author of the panel opinion also held at pages 7-8 that it had been error to dismiss the amended complaint as to Denise Thomas for the additional reason that the 2009 panel opinion had determined that Pearson's complaint had stated a claim for deliberate indifference against a John Doe defendant subsequently identified in the 2011 amended complaint as Thomas.

II

Since McGrath does not bear the burden of proof at trial, under Celotex Corp. v. Catrett, 477 U.S. 317 (1986), he does not need to supply an affidavit describing his treatment decisions, he needs only to identify those portions of the record that he believed demonstrated the absence of a genuine issue of material

5

fact.  It is then Pearson's duty as the nonmoving party to make a

sufficient showing of a genuine issue on the essential elements as

to which he has the burden of proof.  See id. at 323.  The same is

true for the other moving defendants.

In its 1986 trilogy of cases construing Fed.R.Civ.P. 56,

the Supreme Court explained the purpose and procedure of summary

judgment motions:

Summary judgment procedure is properly regarded not as a disfavored
procedural shortcut, but rather as an integral part of the Federal
Rules as a whole, which are designed "to secure the just, speedy
and inexpensive determination of every action." Fed.Rule Civ.Proc.
1 ... . Before the shift to "notice pleading" accomplished by the
Federal Rules, motions to dismiss a complaint or to strike a
defense were the principal tools by which factually insufficient
claims or defenses could be isolated and prevented from going to
trial with the attendant unwarranted consumption of public and
private resources. But with the advent of "notice pleading," the
motion to dismiss seldom fulfills this function any more, and its
place has been taken by the motion for summary judgment. **Rule 56
must be construed with due regard not only for the rights of
persons asserting claims and defenses that are adequately based in
fact to have those claims and defenses tried to a jury, but also
for the rights of persons opposing such claims and defenses to
demonstrate in the manner provided by the Rule, prior to trial,
that the claims and defenses have no factual basis.**

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)(my emphasis).

Where a motion for summary judgment puts a matter at issue, it is

the non-moving party's duty to produce or point in the record to

evidence as to that matter sufficient to allow a properly

instructed jury to return a verdict for that party at trial.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Some

metaphysical doubt as to McGrath's alleged pique at being disturbed

at home as a motive for ordering Pearson to be observed in the

infirmary instead of immediately sent to the hospital, where it would make no sense for him to prefer one treatment decision over the other for that reason, simply is not enough to create a genuine issue as to deliberate indifference.  The same is true of Rhode's alleged callousness in allegedly making Pearson crawl across his cell to a wheelchair, after which Rhodes took Pearson to the infirmary, examined Pearson and admitted him to the infirmary.  As the Supreme Court said in <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), if the factual context renders a party's claim implausible, that party "must come forward with more persuasive evidence to support their claim than would otherwise be necessary."

### III

After the mandate was received I granted Pearson's motion for counsel, and that took some time given the few counsel willing to accept appointment.  After counsel appeared at the end of 2013 I held a brief status conference to set a date for Pearson's counsel to answer McGrath's motion for summary judgment.  On the near approach of that date in March 2014, Pearson's counsel filed a motion at docket no. 115, seeking funds to retain an expert to help develop malpractice and informed consent claims against the hospital where Pearson's appendectomy was performed and the surgeon who performed it.  I emphasize that the motion did not even attempt to relate the funding requests to Pearson's deliberate indifference

claims, or even to any of the defendants against who Pearson had stated deliberate indifference claims.

I denied the motion to fund the plaintiff's retention of an expert for state law claims. Since that time Young v. Martin, 2015 WL 5202968 at *11 (3d Cir. Sept. 8, 2015) has in a precedential opinion reiterated Boring v. Kozakiewicz, 833 F.2d 468, 474 (3d Cir.1987)'s holding that Fed.R.Evid. 706 does not give a court the power to tilt the scales in favor of one litigant by funding its expert witnesses. To avoid any further doubt about the matter, I also set a date for counsel to file any objections to the recommendations that I had made since April 2009 and that had not been in dispute even in the two interlocutory trips to the circuit, that there were no state law claims at issue in this court.  docket no. 117.  Counsel filed timely objections at docket no. 118, making other arguments but chiefly urging that the Court should permit the filing of another amended complaint (no proposed complaint was actually submitted) so that Pearson could make state law claims. See also docket no. 120.

In June 2014, the Court dismissed the amended complaint as to the defendants other than the moving defendants without leave to amend the complaint, and expressly declined jurisdiction over any state law claims.  docket no. 121.  I issued a final discovery schedule so that McGrath and the Pennsylvania Department of Corrections defendants, who by this time had waived service and

8

appeared by counsel, would be on the same schedule for filing summary judgment motions. docket no. 122. Discovery took place without any reported problems, and the parties fully briefed the Eighth Amendment claims.

Defendant McGrath makes two points: there is no evidence that McGrath caused Pearson any harm, and no competent evidence of the component parts of any deliberate indifference claim the standard of care, of any breach thereof, or that McGrath had a culpable state of mind. Defendants Papuga, Thomas, Kline and Rhodes are each involved at a different stage of events but essentially make the same legal argument, that they were not deliberately indifferent to any serious medical need. Plaintiff Pearson makes the overall argument that the evidence of the hostile attitudes of Rhodes and McGrath support an inference that the delays in the steps in Pearson's care were not merely negligent, but the result of deliberate indifference.

IV

I accept the facts as plaintiff Pearson, the non-moving party, presents them, although I do not accept his speculations or his conclusions where they are an improbable extrapolation from any reasonable inference of fact. At 1:00p.m. on April 10, 2007, Pearson was feeling severe stomach pain, and bypassing the sick call procedure he went to what has been described as the "queuing area" outside Deputy Superintendent Sylvia Gibson's office to ask

9

her to request the medical department to examine him.  As a result of Gibson's intervention, defendant Denise Thomas, a nurse, examined Pearson in the queuing area.

Thomas told Pearson that she believed Pearson had a pulled muscle and did not need emergency treatment, and she placed Pearson on sick call for the next day.  Thomas testified that she reached this conclusion as a result of Pearson's demeanor that was "animated and mobile" with "no guarding or facial grimacing," and because she knew Pearson had asthma, was coughing a lot as a result, and his right-side pain could have been caused by a pulled muscle.  Thomas did not review her examination or actions with any other medical staff.

Pearson returned to his cell and around 5:00p.m. requested the correctional officers on his unit to send him to the medical department.  Pearson told an inmate named Patrick Coleman about his stomach pain and that he could barely walk.

Pearson went to the medical department, where another inmate told him that defendant Linda Kline, a nurse, indicated to the inmate that Pearson could elect to see Kline and be charged an $8.00 copay or he could wait to be seen at his scheduled sick call the next day.  Pearson elected to be seen immediately.  Kline's SOAP notes (subjective objective assessment plan) reflect that Pearson commented that "the pain is bad."  Kline took Pearson's history, temperature, and blood pressure, and offered Pearson

10

Tylenol and Maalox, two over-the-counter medications, and Pearson
declined them.   Kline did not review her examination or actions
with any other medical staff.

Pearson again returned to his cell.   Around 11:00p.m.
Pearson requested a corrections officer in his unit to contact the
medical department for medical assistance.   The corrections officer
did so and then told Pearson that a nurse was not going to come to
the unit because Pearson had already been seen twice that day and
was on sick call for the next day.

At this point, Pearson began "yelling and screaming"
about his level of pain.   After several hours of this, a
corrections officer on the unit contacted the medical department
around 2:30a.m. on April 11, 2007.   Defendant David Rhodes, a
nurse, came to the unit at 2:50a.m., examined Pearson, and decided
to move Pearson to the infirmary overnight.   According to Pearson,
Rhodes told Pearson that he had to move from his bunk to the
wheelchair on his own or Rhodes would not take him to the medical
department, and Pearson crawled across the floor from his bunk to
the wheelchair.   Rhodes denies that this happened at all, but as
with any "he said-he said" account, a jury could credit Pearson's
account over Rhodes.

Once at the infirmary, the notes relate that Rhodes
examined Pearson, taking a history and temperature, and Pearson
told Rhodes that he experienced stomach pain all day and it "feels

11

like 5 charley horses". Rhodes testified at his deposition that he concluded that one possibility was that Pearson had appendicitis and that it bore watching, which is why he kept him in the infirmary. Rhodes did not call anyone else to review his examination of Pearson or his actions, and did not provide Pearson with pain medication or send Pearson to a hospital. Rhodes has the authority to send inmates to a hospital in emergencies. Rhodes told Pearson that he would be seen by a doctor in the morning.

Pearson spent the night in the infirmary. When Pearson was examined at 8:10a.m. by a nurse named Magyar, Pearson again described his pain as "feels like 5 charley horses." The medical doctor on staff, a Dr. Ghatge, saw Pearson around 10:00a.m. and ordered him to be sent to the Somerset Hospital.

Pearson was taken to the Somerset Hospital, arriving around 11:00a.m. The emergency room physician prescribed 1-2 mg of Dilaudid for Pearson, who described his pain at a 10/10 on the pain scale. Pearson went into surgery several hours later and his inflamed appendix and a gangrenous part of his omentum measuring 10cm by 11cm were removed that evening by a Dr. Pradhan. Pearson remained as an inpatient at the Somerset Hospital for three days.

When Pearson returned to S.C.I. Somerset, there were no restrictions placed on him by Pradhan or any other physician. Defendant Robert McGrath, a staff physician at the prison, ordered Pearson returned to his block, with a prescription of pain

12

medication, and a follow-up medical appointment scheduled. Pradhan had ordered a tele-med conference after one week as a follow up to Pearson's surgery. This did not take place because one day after returning from the hospital, on April 15, 2007, Pearson began to experience sharp pains in his penis and what he described as profuse bleeding from his penis. Pearson testified at his deposition that when he first experienced this bleeding, blood immediately soaked through his long johns.

Pearson immediately told a corrections officer on his unit that he was bleeding and requested attention from the medical department. Upon being called, Kline told Pearson without examining him that his condition was normal after surgery and to just lie down in his bunk. Later, another corrections officer coming on shift saw Pearson and sent him to the medical department.

Pearson arrived in the medical department. Notes reflect the observation that Pearson had noticeable bleeding from his penis and a moderate amount of blood on his long johns. Pearson stated that Magyar told him that he should be ready for a possible trip to the hospital. Magyar called McGrath and presumably related her observations. McGrath directed that Pearson remain in the infirmary overnight for observation and gave orders for antibiotics in case of infection, lab work to be done in the morning, and increased intake of fluids. Someone allegedly told Pearson that

13

McGrath was mad that he was called at home.   The SOAP notes from later that evening report that Pearson's bleeding stopped.

McGrath saw Pearson on the morning of April 16, 2007. McGrath told Pearson that his condition was normal after surgery and discharged Pearson back to his unit.   McGrath testified that he did not observe fresh bleeding.

Pearson, back on the unit, began bleeding again on the night of April 16, 2007.   Pearson had stolen gloves from his work assignment in the kitchen, and collected what he estimated as a quarter cup of blood to document his condition.   He showed this to a corrections officer, Sergeant Ritenour, on the morning of April 17, 2007.   Ritenour related Pearson's actions to his supervisor, defendant Captain Thomas Papuga.   Papuga directed Ritenour to tell Pearson to discard the blood, and Pearson discarded the blood in the toilet in his cell.   Coleman was again a witness to these events.   According to Pearson, Papuga also did not contact the medical department about this incident, but Pearson does not have a basis for this statement.

Pearson had more bleeding from his penis that morning, and told a corrections officer.   That corrections officer sent Pearson to the medical department at approximately 7:00a.m.   The medical department notes reflect an observation of gross bleeding from Pearson's penis.

14

McGrath examined Pearson, considered the fresh bleeding he observed to require emergency treatment, and sent Pearson back to the Somerset Hospital for care that same morning. Examination at the hospital revealed that Pearson had a urethral tear from the Foley catheter inserted during his appendectomy. Pearson was treated by cauterization. He returned to S.C.I. Somerset without further reported complications. Ghatge assessed Pearson upon his return, and McGrath saw Pearson on April 18, 2007. McGrath discharged Pearson from the infirmary.

V

Before turning to the medical care claims, I want to address the evidence against defendant Papuga. It amounts to the flimsiest of nonclaims imaginable. Anyone familiar with children's sports has seen the revolution in seriousness with which coaches and players must treat even the most insignificant risk of exposure to blood; anyone reading the news is familiar with inmates using bodily fluids, especially blood, as weapons. If Pearson's account is believed (and Ritenour and Papuga did not recall events at all they way Pearson does), Papuga had a subordinate report to him that an inmate serving a life sentence was on the unit with a quarter cup of blood in his possession, in a container suitable for use as a delivery vehicle. Rather than ordering a hazmat team to Pearson's cell, Papuga testified he took a less excited route, calling the medical department and hearing that the blood was a

15

normal consequence of the surgery. If a jury accepted Pearson's account that Papuga ordered disposal of the blood, there is nothing outside of Pearson's speculation to indicate that Papuga ordered Ritenour to order Pearson to dispose of the blood to "hide" Pearson's urethral tear, much less that Papuga did so with deliberate indifference to a serious medical need. Papuga, since he contacted the medical department for guidance, had to have known the medical department was already treating Pearson and could not "hide" anything. Further, there is no evidence, even speculation, that any order by Papuga or even this entire episode affected Pearson's care in any way, much less that Papuga caused Pearson any injury.

As can be seen from even a casual read of plaintiff's brief, although Pearson underwent two episodes of hospitalization, Pearson's only viable claim must be directed to what Pearson would characterize as deliberate indifference to his level of pain is before the appendectomy because he was not provided with Dilaudid or some other strong analgesic until he reached the Somerset Hospital. There is no claim, with or without expert testimony in support, that anyone providing the care Pearson received for his appendicitis was deliberately indifferent to Pearson's appendicitis, nor is there even an argument that whatever lapse of time there was between Pearson's first complaint of abdominal pain and his appendectomy caused any harm, other than pain, to Pearson.

16

Assuming that a jury found Pearson's account true, they could find that Thomas, Kline, and Rhodes all misdiagnosed Pearson's appendicitis, in Rhodes' case by mistaking the potential for the actual. But that is not deliberate indifference: no one, whether a nurse, physician or corrections officer can be deliberately indifferent to a condition he or she believes not to exist, even if that belief is erroneous. "The United States Navy ignored the risk of Japanese attack at Pearl Harbor" means that someone with command authority at Pearl Harbor knew an attack was coming in early January 1941 and chose to do nothing. That is deliberate indifference. "The United States Navy failed to anticipate the Japanese attack by correctly discerning Japanese intentions or by conducting more thorough long-range patrols" means the Navy would have known of the attack if it had been more diligent. That is negligence. Pearson's evidence at most could amount to proof of negligence.

The gist of Pearson's argument as to the pre-appendectomy period is that he should have been at least provided pain medication "sooner." Evidence that pain medication was not provided sooner is no more adequate to prove deliberate indifference than a naked assertion that a defendant should have done "more" or "something different." There is no evidence of the standard of care in cases like Pearson's that suggests that any defendant was negligent in failing to give Pearson a stronger pain

17

reliever than the Tylenol Kline offered Pearson at the medical department.

There is no evidence to sustain any claim against McGrath, who first enters into Pearson's care after the appendectomy. Addressing first McGrath's post-appendectomy care in deciding to release Pearson to his unit after three days in the hospital rather than keep Pearson in the infirmary, it is not the case that a jury can infer in a vacuum that when there is a choice of alternative courses of action that the action that was not taken was the correct one, much less that this allows the further inference that the action taken was the result of deliberate indifference. There is no evidence McGrath breached any standard of care, or even that he contradicted a restriction the operating surgeon, Pradhan, believed was necessary. McGrath's release of Pearson to his unit was accompanied by a prescription of pain medication, "incentive spiromotry," (Pearson's asthma was being treated by the medical department during this time) and a follow-up medical appointment, hardly abandonment of Pearson without care.

As for Pearson's subsequent complaint of blood from his penis from what was believed to be the Foley catheter, there is no competent evidence that McGrath's initial estimation that the blood reported was a normal consequence of the surgery was incorrect, much less that McGrath concluded that in fact Pearson had a urethral tear and then ignored it. The same is true of McGrath's

18

decision to have Pearson stay overnight in the infirmary instead of sending him to the Somerset Hospital. Additionally, there is no evidence that the resulting difference of several hours in Pearson's return to the hospital several hours earlier caused Pearson any injury, or even that McGrath's decisions would have led to any different scheduled time for the cauterization procedure. It is improper in considering the propriety of medical care to pick out one isolated stage of the entire course of treatment and claim that this is evidence of deliberate indifference.

The obvious hole in Pearson's case against McGrath and against Thomas, Kline, and Rhodes is Pearson's lack of competent evidence. Plaintiff's counsels' motion for court funding for an expert witness was couched as in support of a certificate of merit to support claims under Pennsylvania professional negligence law. See Liggon-Redding v. Estate of Sugarman, 659 F.3d 258, 264-65 (3d Cir. 2011). There is no expert evidence in support of any deliberate indifference claim, and only the most cursory argument in plaintiff's brief in opposition to summary judgment that expert witness evidence is unnecessary. It should go without saying that an Estelle v. Gamble claim is not a cut-rate negligence claim without the need for expert witnesses. The gratuitous comment at pages 6-7 of the panel opinion that "[i]t is not clear that an expert opinion is necessary in this case. See Brightwell v.

19

Lehman, 637 F.3d 187, 194 n.8 (3d Cir.2011)" needs to be addressed head-on so that there is no mistake.

The cite to Brightwell v. Lehman for the proposition that expert testimony may be unnecessary to prove deliberate indifference is correct only in the existential sense that there are such cases. The requirement of expert testimony is an evidentiary issue, not an element of the cause of action. That means, however, that the requirement of expert testimony in a deliberate indifference case depends on the facts of each case, and generally, in medical matters, expert testimony is necessary to prove that a medical need is serious, to establish the standard of care or the breach, or to prove causation of injury, unless the "matter ... is so simple ... as to be within the range of ordinary experience and comprehension of even nonprofessional persons." See Brannan v. Lankanau Hospital, 417 A. 2d 196, 201 (Pa.1980), quoting Chandler v. Cook, 265 A.2d 794, 796 (Pa.1970). See also Festa v. Greenberg, 511 A.2d 1371, 1376 (Pa.Super.1986) alloc. denied, 527 A.2d 541 (Pa.1987) (expert testimony needed in informed consent cases to establish the existence of medical risks about which the average juror has no knowledge); Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir.1987)(expert testimony required to prove that a medical need was serious), cert. denied, 485 U.S. 991 (1988). Compare Bushman v. Halm, 798 F.2d 651, 658-59 (3d Cir.1986)(expert

20

testimony not necessary in a motor vehicle collision to prove causation of trauma).

Estelle v. Gamble at 429 U.S. at 104 n.10 itself gives useful examples of lower court cases that illustrate when deliberate indifference in medical treatment of inmates can be inferred without expert evidence: the first, that of a doctor choosing the "easier and less efficacious treatment" of throwing away the ear of prisoner injured in an altercation and stitching the stump rather than trying to save the ear; the second, that of a doctor injecting a prisoner with penicillin despite **knowledge** that the prisoner was allergic to penicillin; the third, that of a prison doctor discharging an inmate from the prison medical service the day after his return from surgery at a hospital and thereby requiring him to stand and walk without first checking with the outside surgeons who had operated on the inmate's leg to determine whether the inmate could stand without injury.

The conduct of McGrath and the other defendants does not fall into any of these categories, even remotely. Pearson cites four cases that he claims illustrate that no expert testimony is required. This is not like any of them. In Monmouth County Inmates v. Lanzaro, 834 F.2d 326, 345 (3d Cir.1987), the legal injury was lack of access to abortion, the court reasoning that "denial to inmates of services necessary to exercise their right to chose an abortion results in the loss of the right to choose

21

altogether." If elective abortion is anything like the medical care in the instant case, plaintiff has not made the connection. Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir.2004), which mostly addressed the issue of exhaustion of remedies (and the nonliability of corrections officers like defendant Papuga unless they have reason to believe that the prison medical staff is mistreating an inmate, see 372 F.3d at 236), was at the motion to dismiss stage and so did not directly discuss proof at the summary judgment stage. Notably, Judge Becker did comment on the need for expert witnesses in a way directly contrary to Pearson's argument:

[Allegations of] extreme pain and real possibility of permanent injury could qualify Spruill's condition as a serious medical need. **Naturally, this will need to be fleshed out with further evidence (e.g., expert medical testimony),** but at the motion-to-dismiss stage, the complaint is certainly adequate in this respect. (my emphasis)

The other two cases cited also do not help Pearson. In Rouse v. Plantier, 182 F.3d 192 (3d Cir.1999) the plaintiffs had expert testimony, and White v. Napoleon, 897 F.2d 103 (3d Cir.1990), like Spruill, considered a motion to dismiss, not a motion for summary judgment.

In short if a jury believed Pearson's account in full, that jury could conclude that McGrath, and Thomas, Kline, and Rhodes failed to appreciate the severity of Pearson's symptoms, and that in the course of coming close to the correct diagnosis Rhodes was callous to Pearson's complaint of pain. If and only if a jury were presented with expert evidence of the standard of care in the

community, something Pearson has not attempted to present in this case, could a jury go on to find that their failures could amount to even to state law negligence. Without expert testimony that Pearson's symptoms in fact would inform any medical provider that Pearson was in fact suffering from appendicitis hours before Ghatge diagnosed it, Pearson has not submitted evidence from which a jury could find that defendants Thomas, Kline, and Rhodes were deliberately indifferent. Without expert testimony that Pearson's symptoms in fact would inform any medical provider that Pearson was in fact suffering from fresh bleeding from a urethral tear the day before McGrath diagnosed it, Pearson has not submitted evidence from which a jury could find that defendant McGrath was deliberately indifferent. Pearson also has not even attempted to submit evidence that he suffered any harm (beyond the pain he suffered on April 10, 2007) as a result of the actions or inactions of any of these defendants.

Anyone familiar with any medical treatment system, whether a prison medical unit or a community hospital emergency room, understands that doctors and nurses are not omniscient creatures waiting in idleness for one patient to arrive that they will immediately comfort and cure. No rational jury could conclude from the evidence of record that Pearson received less than adequate care. Much less could any jury instructed as to the meaning of deliberate indifference find that any defendant was

23

deliberately indifferent to Pearson's appendicitis, or, even if one accepts the plaintiff's improper isolation of one symptom as if it were the serious medical need, to Pearson's pain.  To repeat what I said in my previous Report and Recommendation, I do not minimize Pearson's pain by pointing out that the defendants did not cause it, and if they failed to appreciate its severity or diagnose its cause with the speed Pearson would have preferred, that is not deliberate indifference.  Summary judgment should be entered for all the defendants.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have fourteen days to file written objections to this Report and Recommendation.

DATE: 30 September 2015

Keith A. Pesto,
United States Magistrate Judge

Notice to counsel of record by ECF

24